This is case number 2014-13, MLC Intellectual Property LLC v. Micron Technology, Inc. Mr. Marino. Good morning, and may it please the Court. We seek reversal for three reasons. It was error to exclude evidence of how the compatible license was negotiated under the Parole Evidence Rule. It was abuse of discretion to exclude expert opinions rooted in established methodologies and intimately tied to the facts of this case. And Rule 37 does not justify excluding a timely filed expert report. To my first point, Parole Evidence. The comparable licenses were both lump sum agreements that the district court concluded. To tie his analysis to the facts of this case... Mr. Marino. Yes, Your Honor. Mr. Stoll, can you address the over... The Court held that there was an overstatement by your expert, Mr. Milano, regarding the Hynex and Toshiba agreements, and specifically whether those reflected or used a 0.25% rate. How do you respond to that? Because there seems to be a number of statements in the expert report itself, for example, at page A906, and also in the deposition testimony of your expert at page A1145, that suggest that, in fact, your expert said that he was understanding that the rate applied in those license agreements was 0.25% to calculate the lump sum. And how do you respond to that conclusion of the district court? I think that's more important than the parole evidence point. Sure. So that goes to the abuse of discretion point, Your Honor. And I would say that this court specifically set the boundaries for the district court review on the Dauber in the Apple v. Motorola case. The court essentially said the court cannot question factual underpinnings of the expert's conclusions. What methodology did your expert use to come up with that understanding? What is the accepted methodology in the field of damages experts or economists that allow you to look at a favored customer clause and think that it was actually used to compute the lump sum? Yes, Your Honor. So this court has expressly endorsed the use of a most favored customer clause, for example, in the Studian-Jenschel-Kohler case v. Dyer. That was the case that was cited in our brief. It's 862F2 at 1564 and specifically 1569 in that case. We specifically said it was okay to use a most favored customer rate to assume that that's the rate that was used in the particular agreement in which it's included. Yes, Your Honor. This court, and I believe it was Judge Markey that wrote the opinion, expressly looked at a most favored customer clause, recognized it provided a strong financial incentive for the plaintiff to demand that rate. I understand that. Just to back up, I understand the relevance of that, fully appreciate the relevance of that, what you just said in a hypothetical negotiation. I think what the district court had a problem with, and I'm also having a problem with, is extrapolating that information to say that, in fact, that 0.25% was the rate that was used in the Hynex and Toshiba license agreements. Okay, so what I think, the way the expert analyzed that fact is to look not at the Hynex agreement itself, but to see what that agreement, what the MFC clause obligated BTG, the licensee, to do in the hypothetical negotiation with Micron, which is to demand a 0.25% rate. He also looked at other evidence about BTG, the same licensor, had been negotiating both with Hynex and with Micron. All three of those negotiations occurred at the same time. One of the other pieces of evidence that the expert looked at was the actual demand letter BTG sent to Micron that's in the appendix at 1204. But, in fact, BTG demanded 0.25% from Micron applied to worldwide sales. Counsel, it seems to me that all you're doing right now is identifying where the 0.25% number comes from. You're identifying the documents in the different areas, but I do have a difficulty with the methodology that was used. There's kind of an underlying methodology for the numbers. We're getting for the moment that the documents you're talking about were not produced on a timely basis, and that's also a big hill you have to climb today in my view. But what's the methodology? And the court, as a gatekeeper, says that the methodology was not reasonable. There are two points. First, I want to point out that the documents were, in fact, timely produced, but the district court focused on was whether they were identified in a response to an interrogatory. But to answer your question, the methodology was to evaluate the negotiations that led to the comparable licenses to understand how that lump sum number had been determined. So, it looks at all the demands that the licensor made. They all consistently demanded 0.25% applied to worldwide sales. That is in the record. That's why I cited those documents. And it then concluded, I believe reasonably, that the same licensor would have, in fact, demanded the same royalty from Micron as it did because we have the letter where they made that demand. The expert did not say that the license document itself reflects the 0.25 rate other than in the MFC clause. And it does clearly reflect, contains that rate in the MFC clause. And the student shop case tells us what this court found was reasonable to infer from the presence of the MFC clause, which is the licensee that demanded that clause to be included was ensuring that subsequent competitors wouldn't pay a lesser rate. This is Judge Schultz. Something you said, I want to ask you about something you said. You said that the expert wasn't saying that the actual rate used was 0.25%. But on page A1145, I'm looking at Mr. Malani's deposition testimony. He specifically said, I would tell the jury that when this agreement was negotiated, that the parties to the agreement considered 0.25% to be the effective royalty rate to which they were agreeing. And so that seems to be inconsistent with your view. No, I think it's perfectly consistent. So the records of the negotiations show that the negotiation was conducted based on a demand calculated with 0.25 rate. The ultimate document didn't contain the rate other than in the MFC clause, but it had a lump sum. And so the expert looked both at the lump sum. He said, that's what the license says. That's the evidence that there was an agreement. I need to now unpack that license to understand I was negotiated to reconstruct how BTG would behave in the hypothetical negotiation. And there's another way to do that that might have been more reliable perhaps, which would have been to actually look at the product sold, look at the value of the patent portfolio itself, really try to unpack it that way as opposed to the methodology that was used by Mr. Malani. Isn't there an alternative methodology that could have been used, but he didn't use? Absolutely. As this court has recognized in Apple v. Motorola, there are always alternative methodologies that can be used. But here the district court went beyond just looking at the methodology. It looked at the actual conclusions. It evaluated the evidence, and it said, and the court concluded that the evidence led to a different conclusion. That, I think, goes beyond the gatekeeping role. Two experts can look at different facts and adopt different methodologies. I understand. Thank you. Let me ask you something else. I just want to ask you about, I have a question about the discovery issues. Yes, Your Honor. Early discovery of the damages series. What is the downside to a patent owner when required to identify the specifics around its damages series before the exchange of expert reports? For example, what is the downside of answering an interrogatory by giving, we think the royalty rate should be this amount, but we reserve our rights to update that when additional discovery is provided or we have more opportunity to review the discovery. Why, I mean, in this case in particular where most of the documents that you're relying on for that 0.25 percent, they're your own documents. So I'm having a hard time seeing the downside of you being required to provide specifics earlier in the case. Your Honor, first of all, the documents were produced by a third party for the most part, BTG. MLC was not the party to these license negotiations. But the problem that MLC encountered there was that the opinions of the expert, which is ultimately what the district court said we should have disclosed, were not formed at the time of the fact discovery. So we gave the methodology to the extent that… Why do, in patent cases, why does it take so long for that to be provided? Why can't that be, I mean, you're saying your damages expert hadn't yet done the work, I guess. But why is that? Yeah, because the court in this case adopted a face discovery schedule. I see my time is up. May I finish my answer? Please answer the question. Yes, Your Honor. So what happens is when you have face discovery, the expert does his or her analysis once he or she is in possession of the facts. So we disclosed the fact that MLC was in possession, and we specifically said in the ROG response, and we will supplement with the expert's conclusions once the expert does his or her analysis. Had there been an order, either through a patent law called rule or through the courts taking action, to set an earlier discovery schedule, then we would have done differently. There was no hide-the-ball here. All right. Thank you. Let's hear from the other side. You have your rebuttal time, Mr. Marino. Thank you, Your Honor. Mr. Cordell. Thank you, Your Honor. Good morning. May it please the court. Ruffin Cordell on behalf of Micron. This court has repeatedly reminded patentees that they must demand any demand for royalty damages to the, quote, claimed invention's footprint in the marketplace, such that it reflects the actual value attributable to the infringing features of the product and no more. The law also universally holds that parties must disclose the evidence and positions that they will advance at trial. Absent following those basic rules, the litigation process devolves into chaos, and that's essentially what happened here, and that's what led Judge Olson to enter the orders that she did. Mr. Cordell, this is Judge Olson. You know, I want to ask you the same question that I just asked Mr. Marino, which is about, I mean, I think you've got a lot of experience on both sides of these cases, and so I want to ask you, what do you think is the downside to a patent owner when required to identify the specific damage theories before the exchange of expert reports? I mean, do parties ever provide a specific royalty rate in response to interrogatories during fact discovery? The answer is absolutely, Your Honor. In fact, the local rules in the Northern District of California were amended in 2017 to make clear that those kinds of damages disclosures have to be done right at the outset. Current Rule 26A1A3 requires that your initial disclosures include those kinds of information, and the policy there is very clear that we want parties to know far in advance of committing significant resources to a case what's at stake. It informs the settlement discussions. It informs the resources that will be devoted to a case. The downside is nonexistent, frankly. It only requires that the parties do the homework that they should have done prior to bringing the case. If additional information is required, for example, revenue information may not be immediately available to the plaintiff. Right. You might not know the amount of the base, but you might have enough information to at least give a preliminary rate. That's exactly right. Particularly in this case where the plaintiff is relying on agreements that had existed for many years, and certainly at least in the advanced stages of this case could have provided those disclosures. And who provided those agreements in this case? They were ultimately produced in discovery, Your Honor, albeit at a late date. They were produced in a listing of documents without any indication of their relevance, and that was difficult here for a couple of reasons. But who produced them? MLC did produce them ultimately. Okay. They may have been sourced from third parties, so I don't want to overstep. BTG was a predecessor in interest to MLC, and so the exact genesis of the documents is less clear. But they certainly were in the possession of MLC in the latter part of 2018 when they sat for their 30B6 deposition, when the CEO and general counsel of MLC sat for that deposition. They had long been in the possession of MLC. And so when he told us affirmatively that not only did they not have any facts to inform the royalty rate, in particular with respect to the Hynex and Toshiba agreements that formed so much of their case, he said that MLC could not infer a royalty rate from those agreements. Right. Mr. Cordell, could I move you to apportionment for a minute? Sure. I have some questions. Our case is told that a patent owner can apportion through the royalty base or the royalty rate. Isn't that right? The original Lucent opinion at the very end, Judge Michelle, does inform us that essentially you have two degrees of freedom. But the later cases from this court caution against... What about Erickson and Exmark? I mean, Erickson and Exmark both say that an expert can apportion through the royalty base or the royalty rate, or both. And doesn't Georgia-Pacific Factor 13 address apportioning for the rate, of course? So here's the difficulty. And it's set forth in Vernetics, citing Erickson, that if we don't apportion the royalty base properly, what you end up with is an overly inflated royalty base that then permits the damages expert for the plaintiff to come up with an eminently reasonable royalty rate, you know, a fraction of a percent. But because the royalty base has been overstated, it ends up being an inflated damages number. So the two degrees of freedom are there. You can adjust one. It's a simple calculation at the end of the day. Rate times base equals damages. But if you don't properly apportion the royalty base, you get that overly inflated effect that Vernetics cautions against, and actually goes on to suggest that it ends up essentially swallowing the entire market value rule because you are allowed to overinflate the royalty base. So you have to do both. Okay, let me ask you something else. I mean, I understand your argument against the position that just because you think you have a comparable license doesn't necessarily mean that you don't have to apportion. I understand your position. But on the blue brief on page 52, MLC argues that the scope of the claim here is commensurate with the accused product and relies on ExMARC to say that because of this, the use of the smallest rule is appropriate. I guess the die, right? So I have two questions for you. What is your response to that is one of them. And the other question is, did they argue this below? So the answer to the first question is that there's no evidence to show that Claim 30, which is the only claim at issue here, in any way, shape, or form reflects the entirety of the SSPPU. What Claim 30 talks about is a simple programming sequence where reference voltages are used in a multilevel cell. That is a part of the operation of these devices, no doubt, but a very small part. You not only have to program them, you have to read them, you have to erase them. These devices are a little unique in the semiconductor world in that they wear out fairly quickly. A statistically significant number of them fail with every operation. So error correction and something called wear leveling are critical components. That was set forth at length in our interrogatory responses at Appendix 1242. Our expert, Mr. Meyer, did a deep dive into it at Appendix A2398 through 2399. So we absolutely dispute any suggestion. As I've turned quickly to Page 52, the blue brief, I don't see a citation to their expert or to any source of evidence. No, but I do see that one thing that's interesting is your statement that you're just talking about Claim 30. At Page 52, they say the asserted apparatus claims are Claim 1, Claim 9, and Claim 30. And Claim 1 and 9 talk about a memory device. You noted correctly that Claim 30 is an apparatus for programming, which seems to be different. But how do you respond? It seems like there's a dispute. Is Claim 1 and 9 a Claim 1 and 9 asserted or not? No, those were excluded by the judge. And I can find the ruling if that would be helpful. But I would quickly point out that Claims 1 and 9 are an alternate form of Claim 30. They still relate to the programming operation. So, again, a portion of, and I'm not suggesting that it's not part of the die, but it's only a portion of the die. And then the other question I had asked you, and I apologize if you already answered this, was do you think that MLC really focused on this scope of claim argument that it's making here on Page 52 below? And it's pretty fair, because it is a legal argument. It is a legal argument, and the answer is no, they did not. Okay. And, Your Honor, I've just confirmed, looking back through my notes, that MLC did, in fact, have the Hynex and Toshiba license before the case began. So this was not a late acquired set of documents. Okay, any more questions for Mr. Cordell? No, thank you. Okay, thank you. Mr. Marino, you have a couple of minutes for the last word. Thank you, Your Honor. So one quick point. Claim 30, as the Court has recognized, is an apparatus claim, not a method claim. So trying to limit it to a method is improper. I want to point out one issue. Counsel talked about the patent local rules. There were no patent local rules that apply to this case, certainly with respect to damages. As counsel said, they were enacted after the fact. And that is extremely relevant, because it distinguishes the cases that the Micron relies on. Because the patent local rules, as this Court has recognized, do create additional discovery obligations that go beyond Rule 26. And that was simply not the case here. So there was no hiding the ball. MLC disclosed the information it had when it had it. It even specified in the response to the ROG that it was going to supplement with the expert's report. And it did. The moment it received the report, it turned it over. Micron never disputed that. It never filed a motion to compel. That's what happened in the cases at the district court level they rely upon, Corning and Brandywine. In those cases, the Court made its views known on what was required in terms of damages contention early in the case with a meaningful opportunity for the plaintiff to comply. That never happened here. Mr. Marino, this is Judge Stoll. Just very quickly, do you agree that Claim 30 is the only claim at issue? At the free trial conference, that is correct. At the time the expert report was prepared and the motion was filed. On appeal, is Claim 30 the only claim that's at issue? It's the only claim that's left in the case due to a subsequent ruling. The other point I want to make is that, and that's why it's abuse of discretion, because the Court never gave any indication to MLC that it was holding it to a higher requirement than Rule 26. And most important, as we highlighted in the gray brief, because it amounted to a terminating sanction, the Court was required under Ninth Circuit precedent to make a finding of malfeasance. And the Court never addressed that issue, let alone make any findings. So that's an independent basis where the Rule 37 sanction should be reversed and remanded. Finally, I submit that Mr. Milani's opinion was eminently reasonable. We had the unusual circumstance of having the same licensor contact three direct competitors and offer them the exact same deal. Toshiba took a deal for $25 million, Hynex won for $21 million, and the evidence that Mr. Milani would have presented at trial was $19 to $22 million. So, perfectly in line with those licenses. I think my time is concluded. Thank you. All right. Thank you. Thank you to counsel for both sides. The case is taken under submission.